UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                                    Case No. 18-CR-62

NUVO CONSTRUCTION COMPANY, INC.,

Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Matthew D. Krueger, United

States Attorney for the Eastern District of Wisconsin, Scott J. Campbell, Zachary J. Corey, and

Michael A. Carter, Assistant United States Attorneys, and the defendant Nuvo Construction

Company, Inc., by its duly authorized representative and by its attorney Dennis P. Coffey,

pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea

agreement:

## CHARGE

2.     The defendant has been charged in counts one to five and counts ten to thirteen of

a twenty-five-count superseding indictment.  The counts in which the defendant has been

charged allege violations of Title 18, United States Code, Sections 2, 1341, 1343, and 1349.  The

defendant, by its duly authorized representative, has read and fully understands the charges

contained in the superseding indictment.  The representative fully understands the nature and

elements of the crimes with which the defendant has been charged, and the charges and the terms

and conditions of the plea agreement have been fully explained to the defendant's representative by its attorney.

3.     The defendant voluntarily agrees to plead guilty to count one of the superseding indictment, which is incorporated as part of this plea agreement as if set forth in full here.

4.     The defendant acknowledges, understands, and agrees that it is, in fact, guilty of the offense described count one of the superseding indictment. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish its guilt beyond a reasonable doubt. The facts in Attachment A are provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

5.     The parties understand and agree that the offense to which the defendant will enter a plea of guilty permits the imposition of a term of probation of not less than one year and not more than five years pursuant to Title 18, United States Code, Section 3561; and a fine in the greater amount of (a) $500,000 or (b) if any person derived pecuniary gain from the offense, or if the offense resulted in pecuniary loss to a person other than the defendant, the greater of twice the gross gain or twice the gross loss, pursuant to Title 18, United States Code, Section 3571. The count also carries a mandatory special assessment of $400 pursuant to Title 18, United States Code, Section 3013(a)(2)(B).

6.     The defendant acknowledges, understands, and agrees that its duly authorized representative has discussed the relevant statutes as well as the applicable sentencing guidelines with its attorney.

2

## ELEMENTS

7.     The parties understand and agree that in order to sustain the charge of conspiracy to defraud as set forth in count one of the superseding indictment, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the conspiracy to commit mail fraud and wire fraud as charged in Count One existed; and

Second, the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

## SENTENCING PROVISIONS

8.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

9.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

10.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in count one of the superseding indictment.  The defendant acknowledges and agrees that its attorney in turn has discussed the applicable sentencing guidelines provisions to the defendant's satisfaction.

11.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history.  The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history.  The parties acknowledge, understand, and agree that the defendant may not move to

3

withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

12.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

13.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

14.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the information is seven (7) under Sentencing Guidelines Manual § 2B1.1(a)(2).

## Specific Offense Characteristics

15.     The parties acknowledge and understand that the government will recommend to the sentencing court that a 24-level increase for a loss exceeding $65,000,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(M) is applicable to the offense level for the offense charged in the information. The parties acknowledge and understand that the defendant may not join this recommendation.

4

## Role in the Offense

16.     Pursuant to Sentencing Guidelines Manual § 3B1.1, the parties acknowledge and understand that the defendant will recommend to the sentencing court that a decrease for mitigating role is applicable to the offense level for the offense charged in the information. The parties acknowledge and understand that the government may not join in this recommendation; however, the government will advise the sentencing court with regard to any facts or law relevant to this adjustment.

## Obstruction

17.     Pursuant to Sentencing Guidelines Manual § 3C1.1, the parties acknowledge and understand that the government will take no position on whether a two-level increase should be given for obstruction of justice; however, the government will advise the sentencing court with regard to any facts or law relevant to this adjustment.

## Acceptance of Responsibility

18.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of its intention to enter a plea of guilty.

## Sentencing Recommendations

19.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which

5

might constitute aggravating or mitigating sentencing factors.

20.     Both parties reserve the right to make any recommendation regarding any and all matters not specifically addressed by this agreement.

## Court's Determinations at Sentencing

21.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement.  The United States Probation Office will make its own recommendations to the sentencing court.  The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth above.  The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

22.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

23.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.  The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule.  The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

24.     The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 45 days before sentencing, and also upon request of the

6

FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. The defendant further agrees, upon request of FLU whether made before or after sentencing, to promptly cooperate in the identification of assets in which the defendant has an interest and cooperate in the liquidation of any such assets.

## Special Assessment

25.     The defendant agrees to pay the special assessment in the amount of $400 prior to or at the time of sentencing.

## Fine

26.     The parties agree to recommend to the sentencing court that no fine be imposed against the defendant if the defendant agrees to pay the government an amount that resolves any civil liability it has related to this matter, including any civil liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, pursuant to paragraphs 27 and 37. In the event that the defendant does not agree to resolve its civil liability and the government were to recommend a fine, the defendant acknowledges and agrees that its attorney has discussed the provisions in Chapter Eight of the Sentencing Guidelines with its duly authorized representative to the defendant's satisfaction.

## Forfeiture

27.     The defendant agrees to the immediate entry of a money judgment of forfeiture against it in an amount to be determined by the sentencing court.

28.     The defendant acknowledges and understands that the government may forfeit assets not specifically identified in this agreement, whether as directly forfeitable assets or as substitute assets.

7

29.     The defendant agrees that it shall not sell, transfer, give away, borrow against, conceal, or remove with intent to sell, from its business premises or any other location where it is storing corporate property, any property item that might reasonably have a resale value of $1,000 or more, without conferring with the United States Attorney's Office.

30.     The defendant agrees to take all steps as requested by the United States, including executing documents needed to pass clear title to forfeitable assets, including substitute assets, to the United States and to facilitate the sale of such forfeitable assets. If called upon to do so by the government, the defendant agrees to testify truthfully in any judicial forfeiture proceeding regarding forfeiture matters, including any proceedings regarding any third-party claims as to property subject to forfeiture in this matter.

## DEFENDANT'S WAIVER OF RIGHTS

31.     In entering this agreement, the defendant acknowledges and understands that it surrenders any claims it may have raised in any pretrial motion, as well as certain rights which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against it, it would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and its attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not the judge was

8

persuaded of defendant's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and it would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on its own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.     At such trial, defendant would have a privilege against self-incrimination so that it could decline to testify and no inference of guilt could be drawn from its refusal to testify. If defendant desired to do so, its authorized representative could testify on its own behalf.

32.     The defendant acknowledges and understands that by pleading guilty it is waiving all the rights set forth above. The defendant further acknowledges the fact that its attorney has explained these rights to its duly authorized representative and the consequences of its waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant's authorized representative under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

33.     The defendant acknowledges and understands that it will be adjudicated guilty of the offense to which it will plead guilty and thereby may be deprived of certain rights.

34.     The defendant knowingly and voluntarily waives all claims it may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

35.     The defendant knowingly and voluntarily waives any claim or objection it may

9

have based on statute of limitations.

## Further Civil or Administrative Action

36.     The defendant acknowledges, understands, and agrees that the defendant's duly authorized representative has discussed with its attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

37.     The defendant agrees to make good faith efforts to cooperate with the United States in promptly resolving any civil liability it has related to this matter, including any civil liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.* Such cooperation shall include (a) submitting a complete and sworn financial statement for the defendant on forms provided by the United States and any documentation required by the forms; and (b) identifying assets in which the defendant has an interest and cooperating in the satisfaction of any liability to the extent called for by any future agreement reached by the parties.

38.     The defendant further agrees not to contest or dispute any action by any federal agency to suspend or debar the defendant from government contracting to the extent such action is related to or arises out of this case.

## GENERAL MATTERS

39.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

40.     The parties acknowledge, understand, and agree that this plea agreement will be

10

filed and become part of the public record in this case.

41.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

42.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

43.     The defendant acknowledges and understands if it violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of its breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## VOLUNTARINESS OF DEFENDANT'S PLEA

44.     The defendant acknowledges, understands, and agrees it will plead guilty freely and voluntarily because it is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

11

## ACKNOWLEDGMENTS

I am the defendant's duly authorized representative. On behalf of the defendant, I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. The defendant's attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with the defendant's attorney and I am satisfied that my attorney has provided effective assistance of counsel.

For Nuvo Construction Company, Inc.:

Date: _Juɴe 4, 2019_

DENNIS P. COFFEY
Authorized Representative
Nuvo Construction Company, Inc.

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant's duly authorized representative. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _Juɴe 4, 2019_

DENNIS P. COFFEY
Attorney for Defendant

For the United States of America:

Date: _6-4-2019_

MATTHEW D. KRUEGER
United States Attorney

Date: _6/4/2019_

SCOTT J. CAMPBELL
ZACHARY J. COREY
MICHAEL A. CARTER
Assistant United States Attorneys

12

## Attachment A

1.       Beginning in approximately June 2004, and continuing through August 2016 in the State and Eastern District of Wisconsin and elsewhere, Nuvo Construction Company, Inc. knowingly conspired with other persons and entities known and unknown, to participate in a scheme to defraud the United States, the State of Wisconsin, Milwaukee County, and other entities, and to obtain money and property from them, namely, payments on contracts and purchase orders, by means of materially false and fraudulent pretenses, representations, and promises, and with use of the United States mail and interstate wire communications.

**Background**

2.       Each year, federal agencies contract to purchase goods and services. In addition, the federal government provides substantial funds to finance construction projects initiated by state and local governments, public transit agencies, and airport authorities.

3.       Some federal contracts are set aside to be awarded only to small businesses that are certified as meeting eligibility criteria relating to their size and status. Similarly, federal law aims to provide small businesses owned by socially and economically disadvantaged individuals an opportunity to compete for federally funded transportation contracts.

4.       Two such programs that assist small businesses are the following:

a.       The United States Small Business Administration's ("SBA") 8(a) Business Development Program ("8(a) Program") helps small businesses that are owned by socially and economically disadvantaged individuals. A firm certified through the 8(a) Program as a Small Disadvantaged Business is eligible to receive federal procurement contracts that are set aside for Small Disadvantaged Businesses.

b.       The United States Department of Transportation's ("US DOT") Disadvantaged Business Enterprise ("DBE") Program helps small businesses that are owned by socially and economically disadvantaged individuals by requiring that a portion of US DOT funds be directed to such firms. As a condition of receiving US DOT funds, the State of Wisconsin maintains a DBE Program according to US DOT regulations. The State of Wisconsin has authorized the Wisconsin Unified Certification Program, a cooperative of Wisconsin cities, counties, and airport authorities that recognize each other's DBE certifications. Milwaukee County is a member of the Wisconsin Unified Certification Program. A firm certified by Milwaukee County qualifies to receive DBE funds for federally funded transportation projects and also for projects funded by other members.

5.       The small business programs described above share certain eligibility criteria that a firm must meet, including the following:

a.       Size: The firm must be small according to SBA size standards and specified levels of average annual gross receipts;

13

b.  Ownership:  The firm must be at least 51% percent owned by a socially and economically disadvantaged individual; and

c.  Control:  The disadvantaged owner must control the firm.  Control includes both day-to-day management and long-term decision-making authority.  Factors relevant to control include whether the disadvantaged owner:  (i) has the experience necessary to control the firm; (ii) has ultimate managerial control over others; (iii) receives higher compensation from the firm than others receive; and (iv) is dependent upon others for critical support, such as financing and bonding.

6.  To become certified under these small business programs, a firm must submit an application and supporting documentation to the certifying agency to show that it meets the eligibility criteria.  Likewise, to maintain a certification, a firm must make periodic submissions confirming that it continues to meet the eligibility criteria.

7.  Any firm seeking a contract with the federal government must register in an online database maintained by the United States General Services Administration ("GSA") and make specific representations regarding the firm, including the firm's qualifications for small business programs.  The firm must renew those representations each year and attest to their accuracy under the penalty of perjury.

8.  Contracting officials for federal agencies rely upon the GSA database in determining whether a firm is eligible to receive an 8(a) set-aside contract.

9.  Jorge Lopez was a Hispanic-American and Minnesota resident who purported to be the 85% owner and president of Nuvo Construction Company, Inc. ("Nuvo").  From inception of Nuvo to the summer of 2004, Lopez worked for Nuvo.  Subsequently, Lopez worked full-time on construction projects for Southwest Minnesota Housing Partnership ("SWMHP"), which is located in Slayton, Minnesota.

10.  Brian L. Ganos was the sole owner and president of Sonag Company, Inc. ("Sonag Company"), a Wisconsin corporation that performed construction work.  Sonag Company operated out of an office building on West Florist Avenue in Milwaukee, Wisconsin ("the Florist Avenue building").  Ganos was also the purported Chief Executive Officer and Treasurer of Sonag Ready Mix, LLC ("Sonag Ready Mix"), of which Sonag Company owned approximately 50%.

11.  Nuvo was a Wisconsin corporation that performed construction work and purported to provide ready-mix concrete.  From the summer of 2004 forward, Nuvo's office was located in the Florist Avenue building.  As noted, Lopez was Nuvo's nominal president and 85% owner.  Ganos purported to own only 15% of Nuvo and to serve only as its vice president.  Nuvo was certified by the SBA under the 8(a) Program as a Small Disadvantaged Business from 2004 until it graduated from the 8(a) Program in 2013.  From 2005 to at least 2016, Nuvo was also certified by Milwaukee County as a DBE to provide ready-mix concrete.

12.  Sonag Ready Mix was a Wisconsin limited liability company owned by Sonag Company and N.R.  It principally provided ready-mix concrete for construction projects The

14

concrete operations were located in Menomonee Falls, Wisconsin, and several sites in Milwaukee, Wisconsin. From at least 2002 to approximately 2015, Sonag Ready Mix's business operations were conducted mainly in an office in Menomonee Falls, Wisconsin. Since 2015, Sonag Ready Mix's business operations have been conducted mainly in an office on West Hampton Avenue in Milwaukee, Wisconsin.

**Conspiracy to Commit Scheme to Defraud**

13. Ganos's company—Sonag Company—performed construction work as a Small Disadvantaged Business certified in the 8(a) Program from 1994 to 2003. Lopez was an employee of Sonag.

14. In approximately 2001, as Ganos anticipated Sonag Company's graduation from the 8(a) Program, Ganos encouraged Lopez to join him in operating an company that would seek certification in the 8(a) Program.

15. Thereafter, Lopez changed the name of a business he owned to Nuvo, and transferred 15% ownership to Ganos, leaving Lopez with 85% ownership. For several years, Lopez attempted to operate Nuvo in Milwaukee with assistance from Ganos and Sonag Company.

16. On or about January 9, 2003, Ganos, Lopez, and others submitted Nuvo's application to Milwaukee County to be certified as a DBE for construction work. The application stated that Lopez devoted 100% of his time to Nuvo, and that Ganos devoted just 5% of his time to Nuvo. The application also stated that Lopez had responsibility for all financial and management decisions. The County certified Nuvo as a DBE based upon those representations.

17. Thereafter, Ganos, Lopez, and others submitted and caused to be submitted No Change Affidavits to Milwaukee County. The No Change Affidavits were submitted in Lopez's name and falsely represented that there had been no changes that would affect Nuvo's eligibility for DBE certification. The most recent No Change Affidavit was submitted in October 2015.

18. On or about June 9, 2004, Ganos, Lopez and others submitted and caused to be submitted Nuvo's application to the SBA to be certified under the 8(a) Program. The application stated that Lopez devoted 100% of his time to managing Nuvo, and that Ganos devoted 0% of his time to managing Nuvo. The application also stated that Ganos was not socially and economically disadvantaged for purposes of the application, and that Ganos did not (a) receive higher compensation than Lopez, nor (b) provide financial or bonding support, office space, or equipment to Nuvo.

19. Just a few days before Nuvo's 8(a) application was submitted, in June 2004, Lopez accepted an offer to begin full-time employment as a Senior Project Manager for SWMHP in Slayton, Minnesota. Around that time, Lopez moved to Minnesota and began working full time for SWMHP. Ganos and Lopez did not disclose this to the SBA in Nuvo's 8(a) application.

20. On or about September 23, 2004, the SBA certified Nuvo as a Small

15

Disadvantaged Business based upon those representations. Soon thereafter, in October 2004, Nuvo submitted a business plan, which upon the SBA's approval allowed Nuvo to bid on 8(a) set-aside contracts. The business plan listed Lopez as having an annual salary of $48,000 per year, and listed Ganos as receiving no annual salary at all. The business plan did not disclose that Lopez was working full-time in Minnesota for SWMHP.

21.     Thereafter, from 2005 to 2012, Ganos, Lopez, and others submitted and caused to be submitted Nuvo's 8(a) annual updates to maintain Nuvo's 8(a) certification. These annual updates fraudulently represented that Lopez was Nuvo's full-time, day-to-day manager and that Ganos received no compensation from Nuvo.

22.     From 2005 through 2012, Ganos, Lopez, and others caused Nuvo to register in GSA databases and complete annual representations in those databases in order to seek federal contracts. These submissions in the GSA databases falsely represented that Nuvo qualified for certification under the 8(a) Program.

23.     In 2005, at Ganos's direction, Lopez arranged for SWMHP to pay his compensation through a consulting contract rather than as an employee. Lopez nonetheless continued to work full time on projects for SWMHP through 2016. Through the arrangement, SWMHP paid Lopez's compensation to Nuvo, and Nuvo then paid Lopez that same compensation through Nuvo's payroll system. Lopez's compensation from SWMHP paid through Nuvo grew from $50,000 in 2005 to approximately $100,000 in 2016.

24.     From 2004 through 2016, Lopez also received an additional, annual salary from Nuvo, apart from the SWMHP compensation. These payments ranged from approximately $48,000 up to approximately $72,000 by 2015. During those years, multiple Nuvo employees earned more income from Nuvo. In some years, Lopez also received modest bonuses.

25.     On or about June 7, 2005, Ganos and others caused Nuvo to submit an application to Milwaukee County to expand Nuvo's DBE certification to include Ready Mix Concrete and Trucking. The application did not disclose that Lopez worked full-time in Minnesota for SWMHP. Based upon this application, Milwaukee Country granted the expansion.

26.     On or about June 18, 2008, Ganos and certain co-conspirators submitted and caused to be submitted a Five-Year Update Form to Milwaukee County—in Lopez's name and signature—that falsely swore that Nuvo continued to meet the DBE eligibility criteria.

27.     From mid-2004 through 2016, Lopez had little involvement in Nuvo. Lopez did not have the benefits or burdens of ownership, nor did he have actual control of Nuvo. Instead, Ganos and others exercised control over key aspects of Nuvo, including long-term strategic decisions, finances, bonding, personnel, compensation, and day-to-day operations. Nor did Nuvo operate independently of other Ganos-controlled companies. Instead, Nuvo's operations, bonding, and finances were entwined with the other the companies, including Sonag Company.

28.     Ganos and others exercised control over Nuvo's bonding, which was essential to obtaining federal set-aside contracts. Ganos arranged for Nuvo to obtain bonding through an agent and personal friend, T.C., who provided bonding for Sonag Company and C3T. Nuvo's

16

bonding was based upon guarantees by Sonag Company and Ganos personally, as well as financial statements that reported the consolidated finances of Sonag Company, Nuvo, and C3T.

29.     Ganos and others exercised control over Nuvo's finances. Ganos determined Lopez's and other Nuvo employees' compensation. Lopez rarely received accurate financial reports or made significant decisions about Nuvo's finances. When Nuvo began generating profits, at Ganos's direction, substantial amounts of money were transferred from Nuvo to companies Ganos controlled, including Sonag Company.

30.     The conspirators took steps to create and maintain the false appearance that Nuvo satisfied the small business programs' eligibility criteria. Such steps included arranging for others routinely to execute contracts, checks, and other documents in Lopez's name; and giving others access to Lopez's email accounts so that emails could be sent and received in Lopez's name.

31.     Ganos and others took steps to make it appear that Nuvo provided ready-mix concrete and trucking independently when, in truth, Nuvo's concrete operations depended heavily on Sonag Ready Mix. From the same office that handled Sonag Ready Mix operations, employees would prepare Nuvo quotes for customers that wanted to purchase from a DBE firm. Sonag Ready Mix employees would take orders for Nuvo and determine which concrete plant would fill the Nuvo order. The same Sonag Ready Mix employees would also generate and send Nuvo invoices. For a time, Sonag Ready Mix employees would simply place a "Nuvo" sticker on the top of invoices generated from Sonag Ready Mix's system. At no time did Lopez have any meaningful involvement in Nuvo's concrete operations.

32.     Ganos and others controlled Nuvo's concrete-related assets. By 2014, five trucks were titled in Nuvo's name. Ganos and others arranged to transfer Nuvo's trucks to a new entity, Grand C Trucking LLC, in which Lopez had no ownership stake. Ganos and others arranged the transfer through transactions created the appearance of a bona fide sale when, in reality, neither Nuvo nor Lopez received any consideration for the trucks.

33.     Ganos and others hired concrete truck drivers onto Nuvo's payroll, partly to create the appearance of Nuvo operating independently. Although these drivers received paychecks from Nuvo, Sonag Ready Mix employees supervised these "Nuvo" drivers and made the personnel decisions regarding them—including hiring, firing, and compensation. Lopez had no control over these Nuvo drivers.

34.     Ganos and others arranged for the bookkeeping between Nuvo and Sonag Ready Mix to promote the conspiracy by making it appear that Nuvo performed concrete work while also ensuring that all profits from concrete sales flowed through to Sonag Ready Mix.

35.     Ganos and others used, and caused to be used, Nuvo's 8(a) Program certification and DBE certification to obtain numerous federal construction contracts that were set aside for Small Disadvantaged Businesses and concrete orders on contracts that were subject to DBE requirements.

36.     The fraudulently obtained federal 8(a) set-aside contracts and concrete purchase

17

orders were performed by various combinations of employees, equipment, and resources of companies that Ganos controlled, including Sonag Company and Sonag Ready Mix.

37.    From 2004 through 2016, Nuvo received millions of dollars in payments for 8(a) set-aside contracts and millions of dollars in concrete purchase orders to which Nuvo was not entitled because Nuvo did not actually meet the small business program eligibility requirements. Many of the payments were transmitted to Nuvo by means of interstate wires and United States mail.

38.    The conspirators shared in the proceeds of the scheme to varying extents with Ganos transferring large sums from Nuvo to other companies he controlled.

39.    On multiple occasions throughout the conspiracy, the conspirators engaged in efforts to conceal the scheme and to obstruct investigations by small business program representatives and criminal investigators. In addition, at certain points when Milwaukee County had inquiries about Nuvo, Ganos and co-conspirators arranged for Lopez to speak with the County and give the impression that he controlled Nuvo.

40.    On or about August 3, 2016, Special Agents from the Federal Bureau of Investigation and the SBA's Office of Inspector General interviewed Lopez as part of a criminal investigation. Lopez made materially false statements to the Special Agents, stating that he was in charge of Nuvo and operated it on a day-to-day basis.

18